[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10710

_____

THE GLYNN ENVIRONMENTAL COALITION, INC.,
CENTER FOR A SUSTAINABLE COAST, INC.,
JANE FRASER,

Plaintiffs-Appellants,

_versus_

SEA ISLAND ACQUISITION, LLC,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 2:19-cv-00050-JRH-BWC

—————————————

Before WILLIAM PRYOR, Chief Judge, and GRANT and KIDD, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether a property owner waived its right to challenge federal jurisdiction over its property under the Clean Water Act, and, if not, whether the citizen-suit complaint against that property owner sufficiently alleges that the property contained "waters of the United States." 33 U.S.C. §§ 1362(7), 1365(a)(1). Sea Island Acquisition, LLC, owns a 0.49-acre parcel on St. Simons Island, Georgia, that contained a wetland. To determine whether it needed a permit to fill the wetland, Sea Island requested a preliminary jurisdictional determination from the United States Army Corps of Engineers. The Corps determined that the parcel might contain "waters of the United States" subject to the Clean Water Act and allowed Sea Island to fill the wetland under a nationwide general permit. After Sea Island filled the wetland, Jane Fraser, the Glynn Environmental Coalition, and the Center for a Sustainable Coast sued Sea Island for violations of the Clean Water Act. Sea Island moved to dismiss the complaint on the ground that the wetland did not satisfy the test for "waters of the United States" under *Sackett v. Environmental Protection Agency*, 143 S. Ct. 1322 (2023). The district court dismissed the complaint. We affirm.

## I. BACKGROUND

We begin with the statutory and regulatory provisions that govern this appeal. The Clean Water Act prohibits "the discharge of any pollutant by any person" into "navigable waters," "[e]xcept as in compliance with" certain sections of the statute. 33 U.S.C. §§ 1311(a), 1362(12)(A). The Act defines "'navigable waters'" as "the waters of the United States," *id.* § 1362(7), and "'pollutant[s]'" as "dredged spoil, solid waste, . . . rock, sand, [and] cellar dirt," among other things, *id.* § 1362(6).

The Environmental Protection Agency and the United States Army Corps of Engineers "jointly enforce" the Clean Water Act. *Sackett*, 143 S. Ct. at 1330. For its part, the Corps "may issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a), (d). Corps regulations define "fill material" as "material placed in waters of the United States where the material has the effect of . . . [r]eplacing any portion of a water of the United States with dry land" or "[c]hanging the bottom elevation of any portion of a water of the United States." 33 C.F.R. § 323.2(e)(1) (2024). A permit issued under section 1344 shields the permit holder from enforcement actions brought by the government or by citizen plaintiffs alleging a violation of section 1311's unlawful-discharge prohibition. 33 U.S.C. § 1344(p). As part of the permitting scheme, "[a]ny applicant for a Federal license or permit" to discharge pollutants must also submit a certification from the state where the discharge will originate that attests that the "discharge will comply with the applicable provisions of" the Clean Water Act. *Id.* § 1341(a)(1).

The Corps may issue permits that allow landowners to engage in otherwise prohibited fill activity. *See id.* § 1344(a); 33 C.F.R. §§ 320.2(f), 323.1 (2024). Section 1344 allows for individual or general permits. The Corps may "issue general permits . . . for any category of activities involving discharges of dredged or fill material if . . . the activities . . . are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). The Corps administers a nationwide permit program under this authority. *See* 33 C.F.R. §§ 330.1, 330.5 (2024). If a landowner submits that his proposed activity complies with an existing nationwide general permit, the landowner "may, and in some cases must, request . . . confirmation that an activity complies with the terms and conditions of" a nationwide permit. *Id.* § 330.6(a)(1).

Nationwide Permit 39, a general permit issued in 2012, allowed landowners to fill wetlands "'for the construction . . . of commercial and institutional building foundations and . . . attendant features . . . necessary for the use and maintenance of the structures.'" *Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1238 (11th Cir. 2022) (alterations in original) (quoting Reissuance of Nationwide Permits, 77 Fed. Reg. 10184-01, 10279 (Feb. 21, 2012)). The Georgia Environmental Protection Division issued a conditional Water Quality Certification "for all projects that were allowed by Permit 39." *Id.*; *see* 33 U.S.C. § 1341(a)(1).

Landowners who anticipate that they might need a permit to dredge or fill their land may "solicit a written, site-specific Jurisdictional Determination . . . from the Corps" to establish whether the Clean Water Act applies to their property. *Nat'l Ass'n of Home Builders v. Env't Prot. Agency*, 786 F.3d 34, 37 (D.C. Cir. 2015). These jurisdictional determinations are "written Corps determination[s] that a wetland . . . is subject to regulatory jurisdiction under Section 404 of the Clean Water Act." 33 C.F.R. § 331.2 (2024). In other words, they "reflect[] the agency's judgment about whether and to what extent a property contains jurisdictional waters, and hence is or is not subject to regulatory jurisdiction under the Clean Water Act." *Home Builders*, 786 F.3d at 37 (citing 33 C.F.R. §§ 320.1(a)(6), 331.2, 325.9 (2024)).

The Corps may issue either preliminary or approved jurisdictional determinations. Preliminary jurisdictional determinations are "written indications that there may be waters of the United States on a parcel [of land]." 33 C.F.R. § 331.2 (2024). Preliminary determinations are advisory only and cannot be appealed. *Id.* Approved jurisdictional determinations, by contrast, are final "Corps document[s] stating the presence or absence of waters of the United States on a parcel [of land]." *Id.* Unlike preliminary determinations, approved determinations "are clearly designated appealable actions." *Id.*; *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (explaining that approved jurisdictional determinations are final agency actions).

Sea Island owns a hotel on St. Simons Island, Georgia. On January 10, 2013, Sea Island requested permission from the Corps to fill 0.49 acres of wetland near that hotel. Its request explained that the company would fill the wetland to construct a new office building and parking lot, so it sought coverage under Nationwide Permit 39. On February 20, the Corps verified that Permit 39 covered Sea Island's proposed activity and issued "a preliminary jurisdictional determination that the 0.49-acre parcel of land might be a wetland." *Glynn Env't*, 26 F.4th at 1238. According to a form submitted as part of Sea Island's request, if Sea Island accepted the Corps's permit verification, its acceptance would "constitute[] agreement that all wetlands . . . on the site affected in any way by that activity are jurisdictional waters of the United States." The form stated that the agreement would "preclude[] any challenge to such jurisdiction in any administrative or judicial compliance or enforcement action, or in any administrative appeal or in any Federal court."

Sea Island filled the wetland after it received the permit verification. But it never constructed an office building or parking lot on the filled wetland. Instead, it covered the land with sodding.

Jane Fraser, the Glynn Environmental Coalition, and the Center for a Sustainable Coast sued Sea Island under the Clean Water Act's citizen-suit provision for illegally filling the wetland. *See* 33 U.S.C. § 1365(a). Their amended complaint alleged "[n]oncompliance with Section 404 of the Clean Water Act," *id.* §§ 1311(a), 1344, because Sea Island failed to comply with Permit 39; and

"[n]oncompliance with Section 401 of the Clean Water Act," *id.* §§ 1311(a), 1341, because Sea Island failed to comply with Georgia's Water Quality Certification. It sought declaratory judgments that Sea Island's authority to fill the wetland under Permit 39 had "expired without compliance" or that the authority was "invalid and void *ab initio*"; and it alleged that Sea Island's "[f]ill [a]ctivities" were "[u]npermitted" in violation of Section 301(a) of the Clean Water Act, *id.* § 1311(a).

The amended complaint alleges that the property is "within the same basin as [Dunbar Creek] and [the creek] is downstream of the" property. And it alleges that the creek and the wetland "are waters of the State of Georgia and waters of the United States." Attached maps of the area show that the wetland was near a salt marsh, which was in turn adjacent to Dunbar Creek. The maps show that the salt marsh, an area of upland, the roads into and out of Sea Island's hotel parking lot, the median between those roads, and another area of upland separated the wetland from Dunbar Creek. An attached expert affidavit explains that the wetland was connected to the salt marsh "via culverts and pipes" and that "[t]he salt marsh is adjacent to and directly connected by surface and ground water to Dunbar Creek." The expert stated that before the wetland was filled, "[p]rior tidal exchange between Dunbar Creek and the Subject Wetland . . . would have supplied nutrients to the salt marsh and Dunbar Creek." Now, "[e]ach time it rains," the expert stated, "the excess unabsorbed amount of chemicals" from fertilizing the sodding that covers the filled wetland "is incorporated into both surface runoff and ground water, and eventually

enter[s] the . . . salt marsh . . . to the west of the Subject Wetland." And "[b]ecause the salt marsh is tidal, each time tidal flooding occurs, . . . the water will 'pick up' a fresh dose of the excess chemicals[,] and . . . [the] contaminated water then flows back into Dunbar Creek when the tide ebbs."

Sea Island moved to dismiss the amended complaint. The district court granted that motion to dismiss on the ground that the environmentalists lacked standing to sue. We vacated the order because Fraser had alleged an injury in fact. *See Glynn Env't*, 26 F.4th at 1243. On remand, Sea Island renewed its motion to dismiss for failure to state a claim. The district court ordered supplemental briefing.

Before the district court ruled on the motion to dismiss, the Supreme Court decided *Sackett v. Environmental Protection Agency*, 143 S. Ct. 1322. The parties then submitted further supplemental briefing, and the district court granted Sea Island's motion to dismiss on the ground that the amended complaint failed to allege facts that would establish that the wetland was a water of the United States under *Sackett*.

## II. STANDARD OF REVIEW

"We review the dismissal of a complaint *de novo*." *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1335 (11th Cir. 2019). We accept as true the allegations in the complaint and attached exhibits and draw all reasonable inferences in favor of the plaintiffs. *Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1297 & n.4 (11th Cir. 2015).

## III. DISCUSSION

We divide our discussion into two parts. First, we explain that Sea Island did not waive its challenge to jurisdiction over its property, under the Clean Water Act, for the purposes of this citizen suit. Second, we explain that the environmentalists' complaint failed to allege sufficient facts to satisfy *Sackett*.

### A. *Sea Island Did Not Waive Its Challenge to the Corps's Jurisdiction over the Wetland in this Action.*

As discussed above, the preliminary jurisdictional determination conditioned Sea Island's acceptance of its permit coverage on a waiver. The Corps determined that "[t]he wetlands/other waters on the subject property *may be* waters of the United States within the jurisdiction of Section 404 of the Clean Water Act." And the Corps stated that it had "determined that the proposed activity [was] authorized under [Permit 39]." But the Corps also informed Sea Island that accepting Permit 39 coverage based on the preliminary determination would constitute an acceptance of the Corps's jurisdiction over the wetland:

> [A]ccepting a permit authorization . . . or undertaking any activity in reliance on any form of Corps permit authorization based on a preliminary [jurisdictional determination] constitutes agreement that all wetlands and other water bodies on the site affected in any way by that activity are jurisdictional waters of the United States, and precludes any challenge to such jurisdiction in any administrative or judicial

compliance or enforcement action, or in any administrative appeal or in any Federal court.

The environmentalists contend that Sea Island waived its right to contest jurisdiction over its wetland, under the Clean Water Act, when it accepted coverage under Permit 39 based on the preliminary jurisdictional determination. Sea Island responds that it did not intentionally and voluntarily waive its right to raise jurisdictional arguments in defense of a citizen suit. We agree with Sea Island.

A waiver is valid and enforceable only if it constitutes "the voluntary, intentional relinquishment of a known right." *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1359 (11th Cir. 2018) (citation and internal quotation marks omitted). On its face, the capacious language of the waiver would seem to encompass citizen suits against violations of the permit. But three aspects of the waiver and the preliminary jurisdictional determination counsel against applying it to this suit.

First, the waiver applies only to actions to enforce the permit authorization, not actions to enforce any provision of the Clean Water Act. The waiver begins by defining the actions that trigger it: "accepting a permit authorization . . . or undertaking any activity in reliance on any form of Corps permit authorization based on a preliminary [jurisdictional determination]." That framing defines the scope of the waiver. Although the waiver then says that it will apply in "any . . . compliance or enforcement action," the text is best read to mean any enforcement *of the permit*. Otherwise, the

waiver would apply to any violation of Clean Water Act related to the property, without regard to the permitted activity. That reading would take the language of the waiver out of context, stretching any "voluntary, intentional relinquishment" beyond the scope of the "known right." *Id.* (citation and internal quotation marks omitted). Sea Island did not waive its jurisdictional challenge for the purposes of suits alleging violations of the Clean Water Act outside of the permit. At a minimum, the environmentalists cannot invoke the waiver to avoid the jurisdictional defense against their claims that arise under other sections of the Act. *Cf. Hawkes Co.*, 578 U.S. at 598–99 (explaining that an approved jurisdictional determination does not protect a landowner from citizen suits alleging non-permit-based violations of the Clean Water Act).

Second, the preliminary jurisdictional determination focuses on enforcement actions brought by the Corps, so there is little reason to think that the waiver binds Sea Island in citizen suits. Both the preliminary jurisdictional determination and the request form concern administrative actions and proceedings related to the Corps's jurisdiction to permit or regulate Sea Island's ability to fill the wetland. That context suggests that the waiver also concerns only actions taken by the Corps.

It is a familiar canon that a "text must be construed as a whole." *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 24, at 167 (2012); *accord United States v. Tigua*, 963 F.3d 1138, 1143 (11th Cir. 2020) (consulting the surrounding provisions in a statute to discern the meaning

of a section). "The entirety of the document . . . provides the context for each of its parts," so we must consider the whole legal document to determine which "one of the possible meanings that a . . . phrase can bear is compatible with" other portions of the text. READING LAW, *supra*, at 167–68. We also presume that "[a]ssociated words bear on one another's meaning." *Id.* § 31, at 195; *accord United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) (explaining that a list of examples in a statute informed the meaning of a term). "When several . . . words . . . are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar." READING LAW, *supra*, at 195. Associated words need not form a list for their meanings to be related. *Id.* at 197.

The context of the request for the preliminary jurisdictional determination concerns only Sea Island's application for coverage under Permit 39 and the Corps's assessment of that application. And the phrase "in any Federal court" follows the phrases "in any administrative or judicial compliance or enforcement action" and "in any administrative appeal." Those phrases most naturally mean administrative or compliance actions brought by the Corps to enforce the permit. Although one might also construe "any . . . enforcement action" to encompass citizen suits, the context of the waiver and the administrative focus of the rest of its language undermine the environmentalists' argument that Sea Island intentionally and voluntarily waived a known right. *See Searcy*, 902 F.3d at 1359.

Third, section 1344 permits based on preliminary jurisdictional determinations function like contracts between the Corps and the permit holder. As the District of Columbia Circuit has explained, property owners seeking preliminary determinations often intend "'to voluntarily waive or set aside questions regarding [Clean Water Act] jurisdiction' over their property . . . [because that] jurisdiction is clear or is otherwise not worth contesting." *Home Builders*, 786 F.3d at 37 (quoting U.S. ARMY CORPS OF ENG'RS, NO. 08–02, GUIDANCE LETTER: JURISDICTIONAL DETERMINATIONS (June 26, 2008)). In return, the landowner receives an expedited determination and "a shortcut into the permitting process." *Id.* That agreement involves only the Corps and the landowner. And under general contract law, "only a party to a contract or an intended third-party beneficiary may sue to enforce the terms of a contract." *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013). That rule counsels against allowing the environmentalists to enforce the waiver. They were not a party to the preliminary jurisdictional determination, so they cannot invoke the waiver in that agreement.

The environmentalists argue that Sea Island should be "estopped" from arguing that the Corps lacked jurisdiction over its wetland because "it acquiesced to the determination" by accepting the Corps's authorization under Permit 39. Judicial estoppel "preclude[s] [a party] from 'asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.'" *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (quoting 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL

PRACTICE § 134.30, at 134–62 (3d ed. 2000)), *overruled on other grounds by Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (en banc). This doctrine applies to "inconsistent position[s] under oath in a separate proceeding" and where the "inconsistent positions were calculated to make a mockery of the judicial system." *Slater*, 871 F.3d at 1181 (citation and internal quotation marks omitted). Where judicial estoppel applies, we have discretion whether to invoke it. *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001) (first explaining the discretionary nature of the doctrine and then defining factors that "inform the decision whether to apply the doctrine in a particular case").

Judicial estoppel does not apply here. Sea Island did not litigate an "inconsistent position . . . in a separate proceeding." *Slater*, 871 F.3d at 1181. At most, Sea Island conceded in its initial motion to dismiss that it "applied for and received a permit . . . to fill jurisdictional waters" under the pre-*Sackett* definition of "waters of the United States." But even if we thought that Sea Island had argued an opposing position, we would not exercise our discretion to estop it from now contesting Clean Water Act jurisdiction over its property. The Supreme Court altered the jurisdictional test between the time that Sea Island accepted its section 1344 permit and the dismissal of the environmentalists' complaint. *See Sackett*, 143 S. Ct. at 1341. That change is reason enough to allow Sea Island's jurisdictional argument, notwithstanding the waiver made a decade before *Sackett*.

### B. The Environmentalists Failed Sufficiently to Allege a Continuous Surface Connection Between the Wetland and a Water of the United States.

As a threshold matter, Sea Island argues that *Sackett* deprived the district court of jurisdiction over this suit. It argues that "*Sackett* . . . eliminates federal subject matter jurisdiction over the specific claims alleged in [the environmentalists'] Amended Complaint" because "*Sackett* clarified that 'waters of the United States' excludes Sea Island's property." But Sea Island conflates subject-matter jurisdiction with legislative jurisdiction over "waters of the United States." "As frequently happens," Sea Island frames "a contention that there is some barrier to granting" the environmentalists' claims "in terms of an exception to jurisdiction of subject matter." *Lauritzen v. Larsen*, 345 U.S. 571, 575 (1953). But "[a] cause of action under our [federal] law was asserted here, and the [district] court had power to determine whether it was or was not well founded in law and in fact." *Id*. So the district court had subject-matter jurisdiction over the suit, even if the Act did not extend legislative jurisdiction over the injury.

Sea Island also argues that "after *Sackett*, there is no longer any continuing violation to be corrected, any effluent standard or limitation to be enforced, or any waters of the United States to be restored," so the case is moot. But Sea Island "confuses mootness with the merits." *Chafin v. Chafin*, 568 U.S. 165, 174 (2013). That the environmentalists' claims fail under the *Sackett* test may doom their claims on the merits, but "[a]s long as the parties have a concrete interest . . . in the outcome of the litigation, the case is not moot."

*Id.* at 172 (citation and internal quotation marks omitted). The environmentalists' complaint may fail, but it is not "so implausible that it is insufficient to preserve jurisdiction." *Id.* at 174.

"To establish a [Clean Water Act] violation, the plaintiffs must prove that (1) there has been a discharge; (2) of a pollutant; (3) into waters of the United States; (4) from a point source; (5) without a . . . permit." *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004); *see also* 33 U.S.C. §§ 1311(a), 1362(7), (12) (prohibiting discharge of pollutants, then defining discharge as "any addition of any pollutant to navigable waters" and navigable waters as "the waters of the United States"). To survive a motion to dismiss, the environmentalists had to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To sustain their claims, the environmentalists' complaint had to allege sufficient facts to support the conclusion that the wetland was a water of the United States.

As the Supreme Court ruled in *Sackett*, the Clean Water Act "extends to only those wetlands with a continuous surface connection to bodies that are waters of the United States in their own right, so that they are indistinguishable from those waters." 143 S. Ct. at 1344 (citation and internal quotation marks omitted). To establish that a wetland is sufficiently "'indistinguishable'" from a neighboring water of the United States, the environmentalists

must allege "'first, that the adjacent body of water constitutes "waters of the United States" . . . ; and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the "water" ends and the "wetland" begins.'" *Id.* at 1341 (alterations adopted) (quoting *Rapanos v. United States*, 547 U.S. 715, 742, 755 (2006) (plurality opinion)).

The amended complaint contains few allegations to suggest that the wetland might be a water of the United States. It alleges that the "basin" of the subject wetland "includes Dunbar Creek," and "Dunbar Creek . . . is downstream of the Subject Wetland." But those uncontested allegations tell us only that the wetland sits in some proximity to Dunbar Creek and that the flow of water moves generally from wetland to creek. The complaint also alleges that both the wetland and the basin "are waters of the State of Georgia and waters of the United States." But that allegation constitutes no more than a conclusory recital of an element of a Clean Water Act violation. *See Iqbal*, 556 U.S. at 678; *Parker*, 386 F.3d at 1008. The complaint also lists various flora and fauna found in the wetland. Although that information might be relevant to the determination that a property is a wetland for other purposes, it tells us nothing about whether the wetland is a "water of the United States" under *Sackett*.

The environmentalists point to their expert's affidavit. The expert stated that "[e]ach time it rains, the excess unabsorbed amount of chemicals" from fertilizers on the filled wetland "is incorporated into both surface runoff and ground water, and

eventually enter[s] the . . . salt marsh." The salt marsh, he added, "is tidal" and "is adjacent to and directly connected by surface and ground water to Dunbar Creek." The expert also stated that "[t]here is a direct connection between the Subject Wetland and the adjacent salt marsh via culverts and pipes," and "[p]rior tidal exchange" occurred between Dunbar Creek and the wetland.

None of the expert's factual statements permits the inference that there was a "continuous surface connection" between the wetland and a water of the United States. At best, the expert offers that culverts and pipes might sometimes connect the wetland to the other bodies of water mentioned, but that fact does not tell us whether the connection is continuous. As for the "[p]rior tidal exchange," the expert does not state that the wetland itself was tidal—only the salt marsh. And "[p]rior tidal exchange" does not support the conclusion that the wetland was tidally connected to a water of the United States when Sea Island requested verification that Permit 39 covered its activities. At that time, the roads and sections of upland already divided the wetland from the salt marsh. So the expert's statements do not tell us whether the wetland had a continuous surface connection to a water of the United States but for "phenomena like low tides." *Sackett*, 143 S. Ct. at 1341 (noting that intermittent ebbs in the tide will not suffice to break a continuous surface connection). Although we construe all reasonable inferences in favor of the environmentalists' complaint, the expert affidavit fails to provide sufficient facts to support a claim under the Clean Water Act.

The environmentalists also point to Sea Island's preliminary jurisdictional determination request. That document reports that, at some data points, the wetland exhibited up to two inches of surface water, a high water table, ground saturation, hydric soils, and wetland hydrology. Although each of these facts might suggest that the property was a wetland in the colloquial or scientific sense, none supports the conclusion that the wetland had a "continuous surface connection" to a water of the United States. *See Sackett*, 143 S. Ct. at 1341 (citation and internal quotation marks omitted).

Finally, several of the documents contain maps showing the wetland relative to Sea Island's hotel, the roads into and out of the hotel, the salt marsh, and Dunbar Creek. But those maps reveal that the wetland was separated from the salt marsh and creek by sections of upland and the roads. The only possible surface connection shown in the maps would flow through pipes and culverts. The environmentalists provide no information about whether there is a continuous flow through those manmade connections. *See Lewis v. United States*, 88 F.4th 1073, 1078 (5th Cir. 2023) (finding ditches and culverts insufficient to establish a continuous surface connection under *Sackett*). So the maps fail to present sufficient facts to support the environmentalists' claims.

The environmentalists argue that their allegation that the wetland, salt marsh, and creek are "waters of the United States" sufficiently alleged jurisdiction because that assertion was a statement of fact that the district court must accept as true. We disagree. As discussed above, the status of a body of water as a "water[]

of the United States" is an element of a claim under the Clean Water Act. *See Parker*, 386 F.3d at 1008. So the environmentalists' bare assertion fails to support their claim. *See Iqbal*, 556 U.S. at 678.

The precedents that the environmentalists cite do not undermine this conclusion. For example, in the only Eleventh Circuit precedent that the environmentalists offer, *United States v. Robison*, we stated that "whether [the creek in question] does or does not actually satisfy [the waters of the United States] test . . . [was] a question for the jury in the first instance." 505 F.3d 1208, 1224 n.21 (11th Cir. 2007). But that statement reflected only that there were disputed facts about the body of water that fell within the purview of the jury. *Id.* at 1211–12. That the "waters of the United States" question warranted jury review in *Robison* does not mean that the environmentalists' conclusory assertion that the wetland was a water of the United States suffices to survive a motion to dismiss.

Next, the environmentalists attack the district court's treatment of the facts alleged in the complaint and the attached documents. They argue first that the district court drew an inference against them by stating that "'the fact that the Subject [Wetland] and Dunbar Creek are in the same basin *does not necessarily establish* there is a "continuous surface connection" between them.'" But the district court was correct that this allegation was insufficient to support the conclusion that there was such a connection. The environmentalists also target the ruling that their allegations failed to *"establish"* jurisdiction, contending that they need only show "plausib[ility]." But none of the facts the environmentalists offer—the

wetland's "'High Water Table,'" "surface 'Saturation,'" soil and vegetation characteristics, or connection to the salt marsh—reveals anything from which we might infer a continuous surface connection to a water of the United States.

The environmentalists last fault the district court for consulting the aerial maps to determine that there was a "clear demarcation" between the wetland and salt marsh. But the environmentalists submitted these maps as attachments to their complaint, and the district court was entitled to rely on that information. *Gill ex rel. K.C.R. v. Judd*, 941 F.3d 504, 514 (11th Cir. 2019) ("[W]hen exhibits attached to a complaint contradict the general and conclusory allegations of the pleading, the exhibits govern." (citation and internal quotation marks omitted)). Although Sea Island could not have destroyed the Corps's jurisdiction by illegally constructing the road between the wetland and the salt marsh to create a "demarcation," *see Sackett*, 143 S. Ct. at 1341 n.16, the amended complaint contains no allegation that a surface connection would exist but for the road, much less that the roads were constructed to illegally circumvent coverage under the Clean Water Act.

In short, the environmentalists' complaint fails to allege sufficient facts to support a conclusion that the wetland had a continuous surface connection to a water of the United States under *Sackett*. Without that element, the environmentalists' claims fail. The district court did not err.

## IV. CONCLUSION

We **AFFIRM** the dismissal of the environmentalists' amended complaint.

WILLIAM PRYOR, Chief Judge, concurring:

I write separately to explain an additional reason that Sea Island did not waive its challenge to federal jurisdiction over its property. As Sea Island argued in the district court, in its initial brief in this Court, and in its supplemental brief, section 1365 of the Clean Water Act does not allow citizen suits to enforce permits issued under section 1344. *See* 33 U.S.C. §§ 1344, 1365. Because there could be no citizen suit based on a violation of the permit, Sea Island could not have knowingly and voluntarily waived its defense against a citizen suit by accepting the permit verification from the United States Army Corps of Engineers. I would join the Fifth and Third Circuits and hold that the environmentalists lack the authority to enforce a permit issued under section 1344. And Sea Island did not waive its jurisdictional challenge to their other claims because it could not have knowingly and voluntarily relinquished a defense to a suit that it could never have reasonably anticipated.

The Clean Water Act provides that "any citizen may commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation." *Id.* § 1365(a)(1)(A). Citizen suits under this provision are enforcement actions. *See Black Warrior Riverkeeper, Inc. v. Black Warrior Minerals, Inc.*, 734 F.3d 1297, 1304 (11th Cir. 2013) (noting that citizen suits should not "nullify the statutory preference for governmental enforcement"); *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52–53 (1987) (comparing citizen suits to government enforcement actions). But the Clean Water Act

does not allow citizens to enforce every violation of the Act. Instead, it defines a limited number of "'effluent standard[s] or limitation[s]'" that citizens may enforce. *See* 33 U.S.C. § 1365(f).

Two of those standards or limitations are relevant here. First, citizens may sue for "unlawful act[s] under subsection (a) of section 1311," *id.* § 1365(f)(1), which prohibits "the discharge of any pollutant" into a "water[] of the United States" without a permit or other exception, *id.* §§ 1311(a), 1362(7), (12). Second, a citizen may sue to enforce "a permit or condition of a permit issued under section 1342." *Id.* § 1365(f)(7). The citizen-suit provision does *not* include an enumerated authorization to enforce a permit or condition of a permit issued under section 1344, like the one issued to Sea Island.

Sea Island argues that the absence of a statutory provision allowing citizens to sue for section 1344 permit violations means that citizens cannot enforce those permits. The environmentalists respond that citizens may enforce section 1344 permit violations through the general authorization to sue for an unlawful discharge under section 1311(a). *Id.* § 1365(f)(1). Sea Island has the better argument.

When interpreting a statute, we generally "'give[] effect'" to "'every word and every provision'" in the statute so that none will "'needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.'" *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 26,

at 174 (2012)). The environmentalists argue that they have a right to sue under section 1365(f)(1) because a violation of a section 1344 permit is also a violation of section 1311(a). But, as noted above, the citizen-suit provision specifies that citizens may sue to enforce "a permit or condition of a permit issued under section 1342," 33 U.S.C. § 1365(f)(7), even though a violation of a section 1342 permit is also an "unlawful act" under section 1311(a), *see id*. §§ 1311(a), 1365(f)(1). Under the environmentalists' reading, citizens could sue for section 1342 permit violations under section 1365(f)(1). That interpretation would render section 1365(f)(7) superfluous.

Another canon of statutory interpretation makes clear that section 1365(f) *excludes* citizen suits for violations of section 1344 permits. When a statute enumerates a list of potential violations, "[t]he expression of one thing implies the exclusion of others." READING LAW, *supra*, § 10, at 107. And when a statute includes "a range of specific possibilities" that "'can reasonably be thought to be an expression of all that shares in the grant or prohibition involved,'" the "inescapable" conclusion is that the list is exhaustive. *Est. of Cummings v. Davenport*, 906 F.3d 934, 942 (11th Cir. 2018) (quoting parenthetically READING LAW, *supra*, § 10, at 107). Here, the Clean Water Act provides eight specific statutory provisions that citizens may sue to enforce. *See* 33 U.S.C. § 1365(f). That the Act omits any mention of section 1344 in this list indicates that citizens may not sue to enforce section 1344 permits.

The Fifth Circuit reached the same conclusion in *Atchafalaya Basinkeeper v. Chustz*, 682 F.3d 356 (5th Cir. 2012). Our sister circuit explained that "the unmistakably clear language of [section] 1365(f)([7])," enumerating a cause of action for section 1342 permit violations, "would have been unnecessary" if citizens could challenge permit violations under section 1365(f)(1). *Id.* at 359. Based on the "established rule of statutory interpretation that no provision should be construed to be entirely redundant," the Fifth Circuit concluded that section 1365(f)(7) provided the exclusive cause of action for citizen suits against section 1342 permit violations. *Id.* at 358–59. Because the Clean Water Act contained no parallel provision for section 1344 permit violations, it held that no such cause of action existed. *Id.* at 360

The Third Circuit has reached the same conclusion. *See Harmon Cove Condo. Ass'n v. Marsh*, 815 F.2d 949, 950–51, 954 (3d Cir. 1987) (holding that the citizen-suit provision of the Clean Water Act "does not authorize an action" based on a section 1344 permit). And so have several district courts. *See, e.g., Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 118 F. Supp. 2d 1115, 1118 (D. Or. 2000) ("There are no implied private causes of action under the [Clean Water Act]; the court therefore has no authority to read into subsection (f)([7]) a definition which would include permits issued by the Corps. . . . [Plaintiff] has no cause of action under [section] 1365(a)(1) because the permits in question were issued under [section] 1344, not [section] 1342." (citation omitted)); *Naturaland Tr. v. Dakota Fin., LLC*, 531 F. Supp. 3d 953, 964–65 (D.S.C. 2021) (citing *Atchafalaya Basinkeeper*, 682 F.3d at 357) ("Notably missing from

the list of effluent standards enforceable in a citizen suit is a standard or limitation in a . . . permit issued under [section] 1344 . . . . Enforcement of a [section] 404 permit is solely within the discretion of the Army Corp[s] of Engineers. The [Clean Water Act] does not provide for a citizen['s] suit."), *rev'd on other grounds*, 41 F.4th 342 (4th Cir. 2022); *Jones v. Rose*, No. CV 00-1795-BR, 2005 WL 2218134, at *23 (D. Or. Sept. 9, 2005) ("[A] violation of a [section] 404 permit condition cannot form the basis for a citizen suit under [section] 1365(a)(1)."); *Watkins v. Lawrence County*, No. 3:17-cv-272-DPM, 2018 WL 6265107, at *1–2 (E.D. Ark. Apr. 11, 2018) (citing *Atchafalaya Basinkeeper*, 682 F.3d 356) ("[T]he County's alleged violations of [its section 1344] permit aren't covered by [section] 1365."); *Pub. Emps. for Env't Resp. v. Schroer*, No. 3:18-CV-13-TAV-HBG, 2019 WL 11274596, at *7–8 (E.D. Tenn. June 21, 2019) (discussing *Atchafalaya Basinkeeper*, 682 F.3d at 359, and concluding that "Plaintiffs . . . have no cause of action against defendant for violating the conditions of a [section] 404 permit").

In response to these arguments, the environmentalists contend that Congress blessed citizen suits for section 1344 permit violations "[b]y implication" by including a cross-reference to section 1365 in section 1344(p). Section 1344(p) states that "[c]ompliance with a permit" under section 1344 "shall be deemed compliance, for purposes of section[] . . . 1365 of this title, with section[] 1311." The environmentalists maintain that this cross-reference supports the conclusion that citizens may sue for section 1344 permit violations.

Section 1365(f)(7) forecloses the environmentalists' proposed interpretation. As discussed, the enumerated list of violations in section 1365(f) compels the conclusion that any provision not mentioned is not susceptible to a citizen suit. *See* READING LAW, *supra*, § 10, at 107. That section 1342 permits are listed but section 1344 permits are not suggests that Congress did not intend citizen suits to enforce the latter. As the Fifth Circuit explained, "[i]t would be especially odd for Congress to provide citizen suits for [section] 1342 permit condition violations so plainly in the text of [section] 1365(f)([7]) and simultaneously to bury the right to sue for [section] 1344 permit condition violations within a tri-level maze of statutory cross-references." *Atchafalaya Basinkeeper*, 682 F.3d at 359.

Moreover, the same language that might imply a cause of action in section 1344(p) also appears in section 1342(k), but Congress nonetheless provided an express citizen-suit cause of action for section 1342. *See* 33 U.S.C. § 1342(k) (stating that "[c]ompliance with a permit issued" under section 1342 "shall be deemed compliance, for purposes of section[] . . . 1365 of this title, with section[] 1311"). If Congress intended the cross-reference to stand alone and create an implied private right of action for permit violations under either section 1342 or section 1344, it need not have included section 1365(f)(7) at all. But the Supreme Court has already explained that the "elaborate enforcement provisions" in the Clean Water Act—like the eight specific citizen-suit authorizations—foreclose any assumption "that Congress intended to authorize by implication additional judicial remedies for private

citizens suing under [the Act]." *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14 (1981); *accord Harmon Cove Condo.*, 815 F.2d at 954. In other words, the Clean Water Act makes explicit the universe of causes of action that it permits. And to read an implied private right of action into the statute would be to ignore not only the Supreme Court's interpretation of this statute but also its repeated warnings not to "'permit anything short of an unambiguously conferred right to support a cause of action.'" *Joseph v. Bd. of Regents of the Univ. Sys. of Ga.*, 121 F.4th 855, 865 (11th Cir. 2024) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002)).

Other provisions of the Clean Water Act also confirm that where Congress intended to allow enforcement actions for section 1344 permits, it said so. Section 1319 authorizes the Administrator of the Environmental Protection Agency to issue a compliance order or "bring a civil action" if he finds that a "person is in violation of section 1311 . . . of this title, *or* is in violation of any permit condition or limitation implementing any of [that] section[] . . . in a permit issued under section 1344 of this title by a State." 33 U.S.C. § 1319(a)(3) (emphasis added); *see also id.* § 1344(g) (allowing states to issue permits under this section with federal authorization). That section also allows criminal penalties against anyone who "negligently violates section 1311 . . . *or* any permit condition or limitation implementing any of [that] section[] . . . in a permit issued under section 1344 of this title by the Secretary of the Army or by a State." *Id.* § 1319(c)(1)(A) (emphasis added). Congress plainly distinguished between violations of section 1311 and violations of section 1344 permits. And Congress understood how to

make that distinction clear. That no such language appears in section 1365 suggests that there is no corresponding authority for a citizen suit.

Finally, the environmentalists argue that this interpretation of section 1365(f) creates its own superfluity problem. They contend that relying on section 1365(f)(7) to conclude that the citizen-suit provision does not allow suits for section 1344 permit violations renders section 1344(p) "and its cross-references to" sections 1311 and 1365 "meaningless." Not so. As we explained in *Black Warrior Riverkeeper, Inc. v. Black Warrior Minerals, Inc.*, "[s]ection 1342(k) affords an absolute defense" to permit holders against citizen suits alleging violations of section 1311 or other provisions of the Clean Water Act. 734 F.3d at 1303. Considering the parallel language in section 1344(p), that subsection must provide a matching "absolute defense." *See id.* But that defense is triggered when an enforcement action alleges that the permit holder's activities violate section 1311 or another section of the Clean Water Act—not when the enforcement action alleges a violation of the permit. *See* 33 U.S.C. § 1344(p) (stating that compliance with a permit constitutes compliance with "sections 1311, 1317, and 1343"); *Black Warrior Riverkeeper*, 734 F.3d at 1303 (explaining that section 1342(k)'s "absolute defense" applies "against citizen suits based on violations of sections 1311, 1312, 1316, 1317, and 1343"). So the absolute defense still stands for permit holders sued under other provisions of the Act. That citizens may not sue for violations of the permit does not render section 1344(p) or the cross-references superfluous.

Sea Island could not have knowingly and voluntarily waived its jurisdictional challenge for citizen suits because the Clean Water Act does not allow citizens to enforce section 1344 permits. In other words, the Clean Water Act does not provide a cause of action for the environmentalists' claim alleging a violation of section 1344. Because Sea Island could not have waived a defense to a cause of action that does not exist *and* because, as the panel opinion explains, the waiver is best read not to operate against citizen suits, I agree that the waiver found in the preliminary jurisdictional determination does not bar Sea Island's challenge to jurisdiction under the Clean Water Act.